**ST. PAUL FIRE AND MARINE INSURANCE COMPANY**

v.

**ROACH BROTHERS COMPANY and Charles G. Roach, Jr.**

**Civ. A. No. 85–5272.**

United States District Court, E.D. Pennsylvania.

March 19, 1986.

Melvin R. Shuster, Philadelphia, for plaintiff.

Patrick O'Connor, Mark Mullen, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

FULLAM, Chief Judge.

The cross-motions for summary judgment in this case raise issues concerning the correct interpretation of two separate insurance policies issued by plaintiff to the defendants. The first, a "professional office package" included, in "Insuring Agreement 43" coverage under the heading "Real Estate Agents Errors and Omissions Liability Protection—Claims Made." This Insuring Agreement required plaintiff to pay

"... amounts you and others protected under this agreement are legally required to pay to compensate others for loss resulting from an error, omission or negligent act committed in the conduct of your real estate business...."

with certain exclusions discussed below, and within the specified policy limits, $100,-000 for each occurrence, $300,000 total.

The second policy issued by plaintiff to the defendants was a $2 million "Umbrella Excess Liability Policy".

Defendants were sued in state court by former clients, Mr. and Mrs. Kirkpatrick. The Kirkpatricks alleged that they had retained the defendants to obtain tenants for a commercial property the Kirkpatricks planned to develop, under a written exclusive-agency agreement; but that the defendants, during the term of their exclusive agency, in derogation of their fiduciary responsibilities and other legal requirements, proceeded to purchase the property and develop it themselves.

Because at least some of the Kirkpatricks' claims were deemed to be within the coverage of the "Professional Office Package" policy, plaintiff undertook defense of the state court suit. Shortly thereafter, however, plaintiff also notified the defendants that, since the policy provided no coverage for claims of punitive damages, or for intentional conduct involving fraud or dishonesty, and since the Kirkpatricks were asserting claims in these categories, defendants might well wish to retain their own counsel to protect their interests not

covered by the policy, and at least to monitor the litigation. Defendants did so.

The Kirkpatricks were asserting losses in excess of $500,000. Plaintiff took the position that the umbrella policy provided no coverage at all against the Kirkpatricks' claims, and that the primary "package" policy provided coverage only against negligence. The defendants disagreed with both propositions. But all concerned agreed that, regardless of the correct interpretation of the insurance policies, it would be in the best interests of both plaintiff and defendants to accept the Kirkpatricks' offer to settle the state litigation for a total payment of $155,000.

The Kirkpatricks were therefore paid $155,000, and terminated the state court litigation. Plaintiff paid the $100,000 policy limit under the "Professional Office Package" policy. Responsibility for initial payment of the remaining $55,000 was split evenly between plaintiff and defendants. That is, plaintiff paid $27,500, defendants paid $27,500, and both sides reserved the right to litigate their respective contentions that the ultimate burden of these payments should have been borne entirely by the other party.

Thus, in the present action, each party is seeking to recover the sum of $27,500 plus interest, from the other. In addition, defendants claim reimbursement of $11,-495.45 in attorney's fees, plus interest.

The court is required to decide two questions: (1) whether the umbrella policy is applicable, and (2) whether plaintiff's obligation to defend includes the obligation to reimburse defendants their cost of obtaining separate representation.

On the first issue, the parties have focused upon an endorsement attached to the umbrella policy, which reads as follows:

"EXCLUSION OF PROFESSIONAL LIABILITY OR ERRORS AND OMISSIONS

In consideration of the premium charged, it is understood and agreed that this policy does not apply to Personal Injury or Property Damage arising out of professional services rendered or which should have been rendered for others in the Insured's capacity as a Real Estate Agent."

Plaintiff contends that this language rules out coverage for claims like the Kirkpatricks'; defendants argue that the exclusion does not apply to the Kirkpatricks' claims; alternatively, defendants assert that the policy is ambiguous, hence must be construed to provide coverage.

Defendants' argument is as follows: The umbrella policy states that it provides excess coverage, in addition to the primary coverages afforded by the policies listed on Schedule A (the "underlying insurance"). The "Professional Office Package" policy is listed on Schedule A—in its entirety, not just the "real estate agent's errors and omissions liability protection" portion. The "exclusion of professional liability or errors and omissions" endorsement on the umbrella policy serves to exclude coverage only for "personal injury or property damage". Moreover, the presence of that exclusion in the umbrella policy is explained by the fact that the "real estate agent's errors and omissions liability protection" section of the Professional Package policy also excludes personal injury and property damage claims from its scope. Therefore, the argument goes, since plaintiff concedes that the Kirkpatricks' claims were covered by the Professional Office Package policy, and since the umbrella policy lists that package policy as underlying insurance, and since the exclusion in the umbrella policy seems tailored to match the language of the package policy, it follows that the umbrella policy provides excess coverage for whatever kinds of claims are covered by the underlying package policy, namely, the Kirkpatricks' claims.

■ I have great difficulty in following the defendants' argument, even if its factual premises were correct. But they are not. For example, the underlying "Professional Office Package" policy, in insuring agreement 43, does end up providing some "personal injury" or "property damage"

protection. Under "Exclusions—Claims We Won't Cover" appears the following:

"*Personal Injury.* We won't cover personal injury claims. By personal injury we mean any of the following:

"False arrest, detention or imprisonment;

"Malicious prosecution;

"Wrongful entry or eviction; or

"Libel, slander or invasion of privacy.

"But this exclusion won't apply to claims of personal injury arising out of your professional services in the listing or sale of real estate."

The correct analysis, in my view, begins with the insuring agreements set forth in the umbrella policy. By the clear and unambiguous language of the insuring agreements, the parties agreed that plaintiff

"will indemnify the Insured for all sums which the Insured shall become legally obligated to pay as damages ... on account of:

1. Personal injuries
2. Property damage
3. Advertising offense

to which this Policy applies, caused by an occurrence."

This case does not involve an "advertising offense" (defined as "committed or alleged to have been committed in any advertisement, publicity article, broadcast or telecast and arising out of the named insured's advertising activities"). Thus, for purposes of this case, the "exclusion of professional liability or errors and omissions" endorsement, in excluding "personal injury or property damage arising out of professional services rendered or which should have been rendered for others in the insured's capacity as a real estate agent" totally eliminates coverage under the umbrella policy for claims such as those asserted by the Kirkpatricks. If the Kirkpatricks' claims fall within the definition of "property damage" or "personal injuries" (in this context, a somewhat doubtful proposition), they are excluded by the terms of the exclusion. If the Kirkpatricks' claims do not fall within the definition of property damage or personal injuries, they are not with-

in the reach of the umbrella policy in the first place.

I therefore need not consider the (entirely plausible, and uncontradicted) affidavits submitted on behalf of plaintiff documenting an informed decision by defendants not to obtain excess coverage for claims against them in their capacity as real estate agents.

Perhaps the strongest support for defendants' position is an internal memorandum dated March 19, 1985, from Miles Ryan, a senior claim representative of the plaintiff, to William Thompson, plaintiff's claim manager, which includes the following:

"... The agent had not notified us that there was an excess policy in existence nor had the insured and our daily did not indicate the existence of an excess policy with St. Paul. It has recently been determined that there was an excess policy in existence with the St. Paul and I'm attaching a copy of that policy. From my review of the excess policy, our Company would be obligated to indemnify in the event of a determination against the insured of a *negligent* breach of a fiduciary duty, discussed in my prior memo."

The claim manager disagreed with Mr. Ryan's initial interpretation of the excess policy, with the result that, not long after Mr. Ryan's memo was sent, defendants were informed of the official position of the plaintiff that the umbrella policy did not provide coverage for the Kirkpatricks' claims.

The defendants argue that, at the very least, this series of events demonstrates that the policy language is ambiguous. I disagree. In the context in which Mr. Ryan's memorandum appears to have been written, it seems probable that he was concentrating on the possibility that not all of the Kirkpatricks' claims were excludable because based upon intentional conduct, and upon his view that there could be such a thing as a negligent breach of fiduciary duty. In any event, I know of no principle of law which would permit a preliminary

interpretation by a claim representative to override the plain meaning of the policy language.

I therefore conclude that plaintiff is entitled to judgment against the defendants for $27,500 plus interest.

The remaining question is whether plaintiff's obligation to defend the interests of its insured, arising by virtue of the Professional Office Package policy, extends to the fees of a second set of lawyers whose services were allegedly made necessary by a potential conflict of interest between plaintiff and its insured.

■ Before reaching the merits of that issue, however, I must consider plaintiff's contention that the defendants are estopped from asserting their claim for counsel fees, or have waived their right to assert it. Plaintiff points out that defendants did not raise the counsel-fee issue in the negotiations which led to their united actions in achieving a settlement with the Kirkpatricks, that the only reservation of rights expressed by either side at that time was the right to pursue their claims for the $27,500 contributed to the settlement, and that the defendants' conduct led plaintiff reasonably to believe that no claim would be made for the amounts paid defendants' separate counsel in connection with the Kirkpatrick litigation. While these arguments have considerable appeal, they do not suffice to present a legal obstacle to defendants' counsel fees claim. The written agreement between plaintiff and defendants concerning the Kirkpatrick settlement (Exhibit "I" to the Gindhart affidavit) was never signed; more importantly, it did not deal with counsel fees, nor did it contain any release provisions. On this record, it seems quite probable that the issue of a claim for counsel fees in the Kirkpatrick action was simply not within the contemplation of counsel. Moreover, even if the draft agreement had been signed, and its assertion that it contained the "entire agreement" between the parties were to be given effect, it seems reasonably clear that the parties were dealing with their respective positions under the umbrella policy, whereas the present counsel fees claim arises under the primary "package" policy.

Accordingly, while the issue is not altogether free from doubt, I conclude that defendants' counsel fees claim is not barred by waiver or estoppel. I therefore proceed to the merits of that claim.

The parties agree that this issue is governed by the law of Pennsylvania, and that the appellate courts of Pennsylvania have not clearly resolved all aspects of the matter. Defendants' argument may be summed up in their citation from P. Magarick's treatise "Excess Liability" ¶ 3.07 (1982 Supp.1985):

"The present trend is to hold that if there is a conflict of interest, an insurer must inform the policyholder of the exact nature of the conflict and give him the right to engage counsel of his own to protect his personal interest at reasonable expense to be paid by the insurer, or to have such counsel selected for him by the insurer at the insurer's expense."

As might be expected, the parties are not in agreement as to the existence, strength, or scope of the alleged "trend". Both sides have marshalled citations from other jurisdictions in support of their respective positions.

A federal court in a diversity case is obliged to decide legal issues as they would be decided by the highest court of the state. Where the highest court of the state has not yet spoken definitively on an issue, it is the task of the federal court to predict how the state court would resolve the issue if presented with it. The first source of guidance must be the decisions of the courts of that state, and relevant enactments of its legislature. That is, the probable direction of developing principles of Pennsylvania law should ordinarily be deduced from Pennsylvania sources.

■ It is clear that in Pennsylvania, as in most other jurisdictions, if an insurance company breaches its duty to defend, it is liable to reimburse the assured the costs the latter incurred in conducting its own

defense. A breach of the duty to defend can occur in a variety of ways; for example, a bad-faith refusal to provide a defense, as in *Kelmo Enterprises, Inc. v. Commercial Union Ins. Co.*, 285 Pa.Super. 13, 426 A.2d 680 (1981); or conflicting contractual commitments to two different assureds, whose interests conflict, as in *Bituminous Ins. Co. v. Pa. Mfg. Ass'n Ins. Co.*, 427 F.Supp. 539 (E.D.Pa.1976). There can also be a breach of the duty to defend which is engendered by a conflict of interests, such that the company's pursuit of its own best interests in the litigation is incompatible with the best interests of the assured. *See DiPramero v. Fidelity & Casualty Co. of N.Y.*, 286 F.2d 367 (3d Cir. 1961) (applying Pennsylvania law).

In the present case, there were at least two potential sources of conflict between plaintiff and its insureds, the defendants: plaintiff's policy did not cover intentional acts of wrongdoing or claims for punitive damages, and the Kirkpatricks' claims greatly exceeded the policy limits. But, since the Kirkpatricks would be entitled to prevail even if they did not prove intentional wrongdoing on the part of the defendants, but merely negligence (for example, a genuine but erroneous belief that the Kirkpatricks had abandoned the project, or a genuine but unfounded belief that the Kirkpatricks had consented to defendant's activities, or lack of communication within defendant's organization concerning their representation of the Kirkpatricks), it was the obligation of the plaintiff to provide a defense. Moreover, that obligation extended to *all* claims asserted by the Kirkpatricks, regardless of the limited nature of plaintiff's obligation to indemnify. *Gedeon v. State Farm Mut. Automobile Ins. Co.*, 410 Pa. 55, 188 A.2d 320 (1963); *Wilson v. Maryland Casualty Co.*, 377 Pa. 588, 105 A.2d 304 (1954); *Cadwallader v. New Amsterdam Casualty Co.*, 396 Pa. 582, 152 A.2d 484 (1959).

With respect to the policy limits, no actual conflict of interest arises except in connection with possible settlement negotiations (for example, an opportunity to settle within the policy limits, favored by the insured but not by the company); although a very great disparity between exposure and policy limits may suggest that the uninsured portion of the claim is what is really at stake in the litigation. But where a claim is settled for the full policy limits, with the consent of the insured, there is obviously neither conflict nor the potential for conflict.

With respect to the existence of both covered and uncovered claims or theories of liability, the potential for conflict is much greater, but actual conflict is not inevitable. In some circumstances, the company might be tempted to save money by urging that the insured was guilty of intentional wrongdoing or wanton recklessness, rather than mere negligence. At the least hint of such a development, an obligation to provide independent counsel would be triggered, and the company's unwillingness to protect the full interests of its assured would probably also trigger a reimbursement obligation.

But I am aware of no case, from any jurisdiction, which has held that the mere theoretical possibility of such a conflict requires the company to pay for the assured's separate representation. The defendants place principal reliance upon the California case of *San Diego Navy Federal Credit Union v. Cumis Ins. Co.*, 162 Cal. App.3d 358, 208 Cal.Rptr. 494 (1984). That case, however, held merely that where punitive damages (not covered) and compensatory damages (covered) are sought against the assured, and the exposure is in excess of the policy limits, and there is an opportunity to settle the entire case within the policy limits, the company is obligated either to settle within the policy limits, or to pay the reasonable expenses of independent counsel to represent the interests of the assured. It is unnecessary for me to essay a prediction as to whether the Pennsylvania Supreme Court would agree with the *Cumis* decision; for even under the holding of that case, defendants would not prevail here.

**140**

It is important to remember that, while the company's obligation to defend is much broader than its obligation to indemnify, its obligation to defend cannot *ipso facto* increase its indemnity obligation. So long as the company has paid its full policy limits in settlement, and has not tolerated any prejudice to the separate interests of its assured, its responsibilities under the policy have been fulfilled. Defendants' counterclaim for counsel fees will therefore be rejected.

### ORDER

AND NOW, this 19th day of March, 1986, upon consideration of the pending motions for summary judgment, it is ORDERED:

1. That judgment is entered in favor of the plaintiff St. Paul Fire and Marine Insurance Company and against the defendants Roach Brothers Company and Charles G. Roach, Jr. in the sum of $30,078.60.

2. The defendants' counterclaim is DISMISSED.