PENNBANK (formerly The Pennsylvania Bank and Trust Company)

v.

ST. PAUL FIRE AND MARINE INSURANCE COMPANY, a.k.a St. Paul Mercury Insurance Company.

Civ. A. No. 85–222 ERIE.

United States District Court, W.D. Pennsylvania.

Aug. 17, 1987.

Susan Hileman Malone, Richard DiSalle, Rose, Schmidt, Chapman, Duff & Hasley, Pittsburgh, Pa., William J. Kelly, Elderkin Martin Kelly Messina & Zamboldi, Erie, Pa., for plaintiff.

John M. McLaughlin, Knox Graham McLaughlin Gornall & Sennett, Inc., Erie, Pa., for defendant.

## OPINION

GERALD J. WEBER, District Judge.

On October 27, 1980, Pennbank officials seized the assets of a corporate client that had defaulted on its loan payments. Although the repossession plan achieved its short term objective, it spawned five lawsuits, an alleged loss of over $700,000 in settlements and over $400,000 in attorneys fees.

We merely paddle in the backwaters of this unusual story. Pennbank has sued its general liability insurer in an effort to recoup at least some of its losses. The insurer, St. Paul, has denied that the policy covers the punitive damages portions of the claims or the attorneys fees incurred by Pennbank. The parties have filed cross-motions for partial summary judgment with briefs and supporting evidentiary materials in an effort to narrow the issues for trial. After a review of the evidence submitted we conclude that there are no disputed issues of material fact on the issues raised by the motions.

## FACTS

Pennbank had loaned approximately $2,000,000 to Ridgeway Steel Fabricators, Inc. and its affiliated companies. The loans were secured by mortgages on real property owned by the companies as well as personal guarantees of the principal owners.

By October 1980, Ridgeway had defaulted on the loans and Pennbank officials contemplated foreclosure on the corporations' assets.

The plan for taking possession of the debtors' assets, as developed by Pennbank officials and as it was ultimately carried out, was to invite Ridgeway's principal officers to Pennbank's headquarters in Titusville, PA, ostensibly to discuss the delinquent loan accounts. While these officials were occupied in a conference room and cut-off from any incoming calls, Pennbank agents fanned to take possession of Ridgeway's real and personal property. Only after the repossession was complete were Ridgeway's officers informed.

Four lawsuits followed. Pyramid Builders, Inc., a company affiliated with Ridgeway but not in default on October 27, 1980 and whose assets were nevertheless seized by Pennbank, sought damages for the wrongful repossession of its property. The Bankruptcy Trustee appointed for Ridgeway and its affiliates sued for damages alleging that the wrongful repossession forced them into bankruptcy and that the assets had not been sold for a reasonable price. The individual officers of Ridgeway who had been detained in the sham meeting sued for false imprisonment. Bruno Manno, a principal owner who was detained in that same meeting filed suit alleging that the deceitful repossession and the manner in which he was informed of it caused him to suffer a heart attack. All of these suits included claims for punitive damages.

Pennbank notified St. Paul of each of these suits and requested that St. Paul provide a defense. St. Paul denied coverage for the punitive damages claims and although it provided a defense in each of the four suits Pennbank alleged that the representation was late and inadequate.

Pennbank retained independent counsel throughout the litigation, purportedly to defend the claims for punitives and to prepare a defense where St. Paul's delays created the need.

The false imprisonment claim was nonsuited and the remaining cases were settled. The settlements totalled $282,500 in cash payments of which St. Paul contributed $275,000, the forgiveness of outstanding obligations and personal guarantees in excess of $400,000, and the relinquishment of Pennbank's interest in certain property, as yet unvalued.

Pennbank alleges breach of the insurance contract and of the insurer's fiduciary duty in St. Paul's failure to provide a prompt and adequate defense and in its refusal to defend and indemnify Pennbank on the punitive damages claims. Plaintiff also charges St. Paul with fraud and deceit for misrepresenting that punitive damages were not covered by the policy. Pennbank seeks indemnity for the amounts it contributed to the settlements and for attorneys fees expended in defending the claims.

## ANALYSIS

### 1) Single or Multiple Occurrences?

St. Paul's liability on the policy is limited to $500,000 per occurrence. Naturally a dispute has arisen as to the definition of occurrence and its application to this fact setting.

The parties agree that the existence of single or multiple occurrences is determined by reference to the cause or causes, and not the injuries or damage done to the victims. *Appalachian Insurance Co. v. Liberty Mutual Insurance Corp.*, 507 F.Supp. 59 (W.D.Pa.1981) (Weber, C.J.) aff'd in pertinent part, 676 F.2d 56 (3d Cir.1982); *D'Auria v. Zurich Insurance Co.*, 352 Pa.Super. 231, 507 A.2d 857 (1986). Pennbank then purports to identify separate causal events for the injuries to Ridgeway, Pyramid, and the individuals. However, the attempted distinction is illusory. While it is true that the individuals' claims derive from their detention in the sham meeting, Manno's personal injury claims

derive from the manner in which he was informed of the loss of his company, and the claims of Pyramid and Ridgeway derive from the deceitful manner in which their separate facilities were seized, it is undeniable that each of these events had its genesis in one occurrence, the development of a single concerted plan for the repossession of the debtors' property.

The rationale in *Appalachian*, subsequently endorsed by the Pennsylvania Superior Court in *D'Auria* as correctly stating the law of Pennsylvania, is very instructive here:

> The general rule is that an occurrence is determined by the cause or causes of the resulting injury .... Using this analysis the court asks if "there was but one proximate, uninterrupted and continued cause which resulted in all of the injuries and damage."
>
> . . . . .
>
> The fact that there were multiple injuries and that they were of different magnitudes and that injuries extended over a period of time does not alter our conclusion that there was a single occurrence. As long as the injuries stem from one proximate cause there is a single occurrence. (citations omitted).

676 F.2d at 61. Pennbank's argument here is an attempt to resurrect the theory rejected in *Appalachian* by fragmenting the causative element, the repossession plan, into its factual minutiae most closely related to each individual injury. In *Appalachian*, the date, time, place, manner and circumstances of the discrimination against each female employee were irrelevant to a determination of the number of occurrences. The determinative element was the existence of one underlying policy of discrimination. Similarly here, the individual components of the repossession plan do not determine the number of occurrences. The fact that Pennbank devised a plan and that each of the component acts was done pursuant to that plan establishes without question that there is one cause and therefore one occurrence.

There being only one occurrence, St. Paul's liability is limited by the terms of the policy to $500,000 plus costs of defense. St. Paul has already contributed $275,000 to the settlement of the underlying lawsuits.

#### 2) Punitive Damages

Plaintiff faced claims for punitive damages in each of the four underlying lawsuits, and settled three of those suits. From the start St. Paul had indicated that punitive damages were not covered under the policy, or were not insurable under Pennsylvania law. By motions for partial summary judgment, the parties have now raised the issue of whether punitive damages are insurable in Pennsylvania.

We note first of all that the policy itself is ambiguous. It neither includes nor excludes coverage for punitive damages. We thus turn to Pennsylvania law on insurability.

In *Esmond v. Liscio*, 209 Pa.Super. 200, 224 A.2d 793 (1966), the Court held that "public policy does not permit a tortfeasor who is *personally* guilty of wanton misconduct to shift the burden of punitive damages to his insurer". *Id.*, 209 Pa.Super. at 215, 224 A.2d 793. The Court went on to distinguish this from the situation where the insured was only vicariously liable for punitive damages:

> Another line of cases, represented by *Ohio Casualty Ins. Co. v. Welfare Finance Co.*, 75 F.2d 58, 60 (8th Cir.1934), is also readily distinguishable. There, the plaintiff won a judgment for punitive damages against the insured arising out of a wanton act by the insured's servant. The Court stated: "In this situation where there was no direct or indirect volition on the part of the master in the commission of the act, no public policy is violated by protecting him from the unauthorized and unnatural act of his servant." In general, allowing one who is only vicariously liable for punitive damages to shift the burden of satisfying the judgment to his insurer does not conflict with the rule of policy which we announce today.

*Id.*, at 214, 224 A.2d 793.

 Thus Pennbank's stated position is correct—Pennsylvania does not preclude

recovery of punitive damages from an insurer where the insured is only vicariously liable for such damages. Unfortunately for Pennbank, the undisputed facts of the present case do not place Pennbank within this exception.

The repossession plan was conceived, approved and implemented by the highest rank of Pennbank management, including the company's president, CEO, senior vice-president, senior counsel and assorted vice-presidents and loan officers. The plan was subsequently ratified by the Board of Directors. This is not the unauthorized and unpredictable act of an agent envisioned in *Esmond v. Liscio.* This is corporate policy, conceived and implemented by those persons responsible for corporate decisions.

■ Pennbank argues that because it is a corporation, a fictional person incapable of tortious conduct, it is necessarily liable only vicariously for the acts of its agents no matter their rank. To accept this argument would make all corporations able to pass off liability for punitive damages to an insurer, regardless of the nature of the act or the level of corporate management involved. This is plainly contrary to the policy behind the holding in *Esmond v. Liscio.* Punitive damages are intended to punish the culpable party. Where corporate management commits an outrageous act, punishment is appropriate. Where the act is committed by a lowly functionary or agent, not pursuant to corporate policy or plan, the corporation, though vicariously liable for punitive damages, is entitled to insure against such damages. We believe this holding to be consistent with *Esmond v. Liscio* and the underlying public policy.

Pennbank places heavy emphasis on *Lokay v. Lehigh Valley Co-op Farmers, Inc.,* 342 Pa.Super. 89, 492 A.2d 405 (1985). Nothing in *Lokay* alters our decision here because *Lokay* addresses an entirely different subject, liability for ultra vires acts.

■ Pennbank has also charged St. Paul with fraud and deceit in failing to disclose an advisory legal opinion obtained from specially retained counsel which indicated that the punitive damages claims might be insurable under the distinction in *Esmond v. Liscio.* Because of our decision on the insurability of punitive damages, this issue is stillborn. However, we would add that such a claim must be based on a misrepresentation of *material fact.* In this case, St. Paul withheld an advisory legal opinion which at best is equivocal on the issue of insurability.[1] This was simply an opinion, not a fact, and cannot form the basis of a claim for intentional misrepresentation.

For the reasons stated, summary judgment will be granted in favor of defendant St. Paul on Pennbank's claims for coverage of punitive damages and claims of fraud and deceit.

### 3) Conflict of Interest

Pennbank contends that a conflict of interest arose with St. Paul over the punitive damages claims which required Pennbank to obtain independent counsel. According to Pennbank, because St. Paul denied coverage for punitive damages, it served St. Paul's interests to construct a defense which would apportion any award more heavily toward punitive damages. Pennbank therefore seeks reimbursement for over $400,000 in attorneys fees.

Plaintiff cites *San Diego Navy Federal Credit Union v. Cumis Insurance Society, Inc.* 162 Cal.App.3d 358, 208 Cal.Rptr. 494 (1984) for the premise that where a conflict arises between insurer and insured, the insurer is obligated under the policy to provide the insured with independent counsel at no expense to the insured. See also *St. Paul Fire and Marine Co. v. Roach Bros. Co.,* 639 F.Supp. 134 (E.D.Pa.1986). Much to its credit St. Paul acknowledges the wisdom of this recent trend and does not gainsay it. However, St. Paul does contend that no conflict of interest exists in the present case.

■ We agree. The interests of insurer and insured in defense of the underlying suits were the same—prevent a finding of

---

1. In all fairness to the counsel who authored the advisory opinion, he interpreted *Esmond v. Liscio* as we do today, but he was not given the information concerning the involvement of corporate management which forms the basis of our decision on this issue.

liability or failing that, minimize damages. Punitive damages can only be awarded where compensatory damages have been awarded and the punitives must have some relation to the compensatory award. E.g. *Delahanty v. First Pennsylvania Bank, N.A.*, 318 Pa.Super. 90, 464 A.2d 1243 (1983). For St. Paul to admit outrageous, intentional and reckless conduct on the part of its insured, or to fail to vigorously defend such charges, would guarantee a large award of compensatory damages as well as punitive damages.

This is not a case where liability can rest on either of two causes of action, one of which is covered and the other not (e.g., negligence and intentional tort). There an insurer would be tempted to construct a defense which would place any damage award outside policy coverage. That is not the case here. Any award of punitive damages would necessarily occasion the overwhelming likelihood of a large compensatory award. Both parties shared the desire to prevent a finding which would justify punitive damages. For this reason, the rationale in *Cumis* is inapplicable here.

### CONCLUSION

For the reasons stated above, we conclude that there was only one "occurrence" within the meaning of the policy, the punitive damages claims against Pennbank in this factual context are not insurable in Pennsylvania, and there was no conflict of interest between insurer and insured which would require St. Paul to bear the cost of Pennbank's independent counsel. Partial summary judgment on these issues will be granted in favor of defendant, St. Paul.

It appears that several issues remain for trial. Pennbank claims that St. Paul's contributions to the settlement do not reflect an adequate apportionment between compensatory and punitive damages, and St. Paul's delay in providing Pennbank with a defense required Pennbank's independent counsel to perform work necessary to the defense, work which should be paid for by St. Paul. Further proceedings shall be governed by the findings and rulings in this Opinion and Order.