**Barbara Mitchell STEVENSON, Annalou Freeman, and Wyrtis Mitchell, by her next friend Annalou Freeman, Appellants–Plaintiffs**

**and**

**Lee Etta R. Mitchell, Individually and as Personal Representative of the Estate of George David Mitchell, deceased, d/b/a Serenity Chapel, Appellants–Defendants/Cross–Claim Plaintiffs**

**v.**

**HAMILTON MUTUAL INSURANCE CO., Appellee–Defendant.**

No. 07A01–9605–CV–158.

Court of Appeals of Indiana.

Nov. 12, 1996.

Rehearing Denied Jan. 8, 1997.

---

Frank A. Barnhart, Barnhart Sturgeon & Spencer, Bloomington, William C. Lloyd, Ferguson Ferguson & Lloyd, Bloomington, for appellants–plaintiffs.

Karl L. Mulvaney, Nana Quay–Smith, Patrick A. Elward, Bingham Summers Welsh & Spilman, Indianapolis, for appellee–defendant.

## OPINION

ROBERTSON, Judge.

George David Mitchell [Decedent] and his wife, Lee Etta R. Mitchell [Widow], both licensed funeral directors, had operated a mortuary business known as Serenity Chapel. Decedent had founded and developed the business. After Decedent's death, Widow continued to run the business as the sole owner and director. Decedent was buried in a cemetery under the direction of Serenity Chapel. Widow and Serenity Chapel were insured under a Business Owner's Policy with a Mortician's Malpractice Endorsement issued by the Hamilton Mutual Insurance Company [Insurance Company].

In 1991, Decedent's daughter, Barbara Mitchell Stevenson [Daughter], initiated a will contest in the Jackson Circuit Court against Widow (who was Decedent's second wife and not Daughter's mother) alleging that Widow had misappropriated Daughter's rightful inheritance by exerting undue influence and fraud over Decedent. At the courthouse on the day that trial was scheduled, Daughter and Widow entered into a settlement agreement, the terms of which were recited in open court and incorporated into a court order. Under the agreement, Widow was to pay Daughter certain sums of money and execute certain documents. The agreement also provided that Daughter could purchase and place a monument on her father's grave in the cemetery and, generally, bear responsibility for maintaining the grave. Daughter purchased and placed a monument on her father's grave.

Widow did not perform her part of the agreement, was held in contempt, and was sanctioned by the trial court. Eventually,

Widow paid Daughter the money owed under the agreement.

However, over the 1994 Memorial Day weekend, Decedent's mother, Wyrtis Mitchell (now deceased) [Mother] and sister (Daughter's aunt), Annalou Freeman [Sister], visited Decedent's grave and discovered that the body had been disinterred and was missing along with the monument which had marked the grave. It was later learned that Widow had caused the body to be disinterred and reburied elsewhere in the cemetery. The new grave had been marked with a used monument engraved with the name and dates of another person. This discovery caused Daughter, Mother, and Sister pain, anguish, and mental suffering.

Daughter, Mother, and Sister sought relief in the pending Jackson Circuit Court lawsuit requesting compensatory and punitive damages against Widow for 1) breach of the settlement agreement, 2) conversion of the monument, and 3) the intentional infliction of emotional distress for her deliberate, willful, outrageous, and bad faith conduct in desecrating Decedent's grave. The trial court held an evidentiary hearing on the matter at which all parties were represented by counsel and presented evidence. It was learned that Widow had applied to the State Board of Health to disinter Decedent before Daughter had placed the monument on the grave, thus establishing that Widow had never intended to honor the settlement agreement/court order with respect to Daughter's right to maintain her father's grave. The trial court entered specific findings to the effect that Widow had covertly, without any notice to the court, counsel, or family members, disinterred Decedent's body as part of a bad faith, malicious, and oppressive plan to vindictively retaliate against the Daughter and Decedent's family with the intention to cause them great anguish. The trial court found Widow, as well as Serenity Chapel, to be liable for the:

> independent tortious conduct that is accurately described as bad faith, fraudulent, oppressive, malicious, and constitutes extreme and outrageous conduct designed to intentionally, recklessly, expectedly, and proximately cause severe emotional distress and harm to [Daughter, Mother, and Sister].

The trial court awarded compensatory damages in favor of Mother and Sister in the amount of $75,000.00 each for:

> the severe emotional distress, depression, anxiety, and apprehension caused to her by [Widow's] tortious and calculated conduct in disinterring [Decedent] as above described, . . .

The trial court awarded Daughter 1) $3,000.00 for the conversion of the monument pursuant to Ind.Code 34-4-30-1 (Civil remedy for crimes against property); and 2) $50,-000.00 for the severe emotional distress, anxiety, depression, and apprehension caused by Widow's conduct in disinterring Decedent. The trial court imposed punitive damages in the amount of $150,000.00 to be shared by Daughter, Mother, and Sister. Widow/Serenity Chapel appealed the decision of the Jackson Circuit Court, and that appeal is presently pending before this court (but, not before the panel in the instant case).

The present declaratory judgment action was then initiated in the Brown Circuit Court against the Insurance Company which has refused to defend or indemnify Widow/Serenity Chapel for the judgment based upon a standard policy exclusion for "intentional or expected conduct." The Insurance Company obtained summary judgment on that basis, and this appeal ensued. Two appellant's briefs have been submitted—one by Daughter, Mother's estate, and Sister, and the other by Serenity Chapel. For simplicity, we will refer to all appellants collectively as Widow. The appellants have submitted an aggregate of eleven issues, which we restate and consolidate into two, neither of which constitutes reversible error. Additional facts are supplied as necessary.

## DECISION

In reviewing a motion for summary judgment, this court applies the same standard as the trial court. *American Family Mutual Insurance Co. v. Dye*, 634 N.E.2d 844, 846 (Ind.Ct.App.1994), *trans. denied.* We must determine whether there is a genuine issue of material fact and whether the law has been correctly applied by the trial court.

*Cloverleaf Apartments, Inc. v. Town of Eaton*, 641 N.E.2d 665, 667 (Ind.Ct.App.1994). Summary judgment is appropriate only if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C); *Heck v. Robey*, 659 N.E.2d 498, 500 (Ind.1995). Neither the trial court, nor the reviewing court, may look beyond the evidence specifically designated to the trial court. *Seufert v. RWB Medical Income Properties I Ltd. Partnership*, 649 N.E.2d 1070, 1072 (Ind.Ct. App.1995). Once the movant for summary judgment has established that no genuine issue of material fact exists by submission of materials contemplated by T.R. 56, the non-movant may not rest on his pleadings but must set forth specific facts, using supporting materials contemplated under the rule, which show the existence of a genuine issue for trial. *Liberty Mutual Insurance Company v. Metzler*, 586 N.E.2d 897, 900 (Ind.Ct.App. 1992), *trans. denied.* A trial court's grant of summary judgment is "clothed with a presumption of validity," and the appellant bears the burden of demonstrating that the trial court erred. *Rosi v. Business Furniture Corp.*, 615 N.E.2d 431, 434 (Ind.1993).

The interpretation of a insurance policy is primarily a question of law for the court, and it is therefore a question which is particularly well-suited for disposition by summary judgment. *Sutton v. Littlepage*, 669 N.E.2d 1019, 1021 (Ind.Ct.App.1996). Where there is an ambiguity, policies are to be construed strictly against the insurance company. *Id.* Strict construction against the insurer is "driven by the fact that the insurer drafts the policy and foists its terms upon the customer." *Id.* The insurance companies write the policies; we buy their forms or we do not buy insurance. *Id.* Thus, the insurance company is bound by the plain and ordinary meaning of the words viewed from the standpoint of the insured. *Id.* However, there is no rule of construction that every term in an insurance contract must be defined, and the mere fact that a term is not defined does not render it ambiguous. *Harden v. Monroe Guaranty Insurance Company*, 626 N.E.2d 814, 817 (Ind.Ct.App.1993), *trans. denied.* Whether a contract is ambiguous is a question of law; and where the court determines there is no ambiguity, the terms of the contract are conclusive and the construction of those terms is also a matter of law to be determined by the court. *Id.* An insurance contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning. *Id.* An ambiguity does not exist simply because a controversy exists between the parties, with each favoring a different interpretation. *Id.*

An unambiguous policy must be enforced according to its terms, even those which limit the insurer's liability. *Trisler v. Indiana Insurance Company*, 575 N.E.2d 1021, 1023 (Ind.Ct.App.1991). Courts may not extend coverage delineated by the policy nor may it rewrite the clear and unambiguous language of the policy. *Id.* However, an exclusionary clause will not be read so broadly as to effectively exclude all coverage. *Id.*

Widow makes an extraordinarily meticulous argument based upon isolated words, punctuation, and quotation marks (or the lack thereof), and the marketing brochures in an attempt to demonstrate certain ambiguities in the policy at issue. Widow's points are often taken out of context and do not materially affect the interpretation of the policy. Our review of the policy has satisfied us that it is standard and unambiguous in every material respect including the coverages provided, as will be discussed below, and the exclusionary clause at issue.

Indiana courts have long upheld standard exclusionary clauses for the insured's intentional acts as in furtherance of the public policy that a person should not be permitted to insure against harms he may intentionally and unlawfully cause others, and thereby acquire a license to engage in such activity. *Home Insurance Company v. Neilsen*, 165 Ind.App. 445, 332 N.E.2d 240, 244 (1975). As stated in R.E. Keeton & A.I. Widiss, *Insurance Law* (1988) § 5.4(d)(1):

The principle that insurance should only be employed to transfer risks associated with fortuitous occurrences means that generally no coverage will exist for a loss that is caused intentionally. In the context of liability insurance, claims seeking in-

demnification for intentionally caused harm are usually denied on the basis of specific coverage terms—typically set forth in the basic definition of coverage—which state the insurer will pay damages for which an insured ... becomes legally responsible *because of an accident.* Furthermore, liability insurance policies have generally included clauses that explicitly preclude coverage for an 'injury ... caused intentionally.' For example, contemporary liability insurance policies frequently state that insurance is provided for damages that are caused by an 'occurrence' which is defined as an *'accident'* that 'results in bodily injury or property damage *neither expected nor intended* from the standpoint of the insured.'

\* \* \* \* \* \*

Courts have clearly and repeatedly affirmed the general proposition that public policy prohibits the use of insurance to provide indemnification for civil tort liability that results from an insured's intentional wrongdoing.

*Id.* at 518–19 (Emphasis original).

In *Trisler,* we analyzed Indiana law with respect to standard "intended or expected" exclusionary clauses, and noted:

The intent aspect ... contemplate[s] the 'volitional performance of an act with an intent to cause injury, although not necessarily the precise injury or severity of damage that in fact occurs.' It is met either by showing an actual intent to injure, or by showing the nature and character of the act to be such that an intent to cause harm to the other party must be inferred as a matter of law.

'Expected' injury means injury that occurred when the insured acted even though he was consciously aware that harm was practically certain to occur from his actions. However, the definition of 'expected' does not exclude harm that the insured 'should have anticipated, ...' Consciousness of the likelihood of certain results occurring is determined by examination of the subjective mental state of the insured.

575 N.E.2d at 1024 (Citations omitted).

## I.

### *Malpractice Endorsement*

Widow points out that the intentional or expected acts exclusion exists in the general Business Owner's Policy. Widow argues that the Mortician's Malpractice Endorsement to the policy broadens coverage to include indemnification for the judgment entered against her in the Jackson Circuit Court.

The general Business Owner's Policy in question contained an exclusion for bodily injury or property damage caused by the rendering or failure to render any professional service. The Mortician's Malpractice Endorsement broadened this coverage as follows:

1. The insurance applies to the liability imposed upon the insured by law for:

a. Damages for bodily injury, sickness, disease or death including any mental anguish;

b. Damages for injury to or destruction of urns, caskets, linings or fittings, casket cases, crypts, mausoleums or other facilities for the care of burial of a deceased human body, belonging to others and in the care, custody or control of the insured, for the purpose of burying or caring for deceased human body; or

c. Damages for injury to or destruction of property of others which is not in the care, custody or control of the insured, *because of any professional malpractice or mistake* in the embalming, handling, disposition, burial disinterment or removal of any deceased human body or any conduct of any memorial service by the insured even though no deceased human body actually be present of because of any injury to, destruction of or interference with the right of the burial of a deceased human body.

(Emphasis added).

▮▮▮▮ Widow argues that the Mortician's Malpractice Endorsement stands alone as a separate contract from the Business

Owner's policy. Thus, she reasons that the "intended and expected" exclusion contained in the Business Owner's policy does not apply and the Endorsement provides indemnification for all liability imposed by law that a mortician may incur. We disagree. An endorsement is ancillary to an insurance policy and it must be read together, construed, and reconciled with the policy to give effect to the whole. *Harden,* 626 N.E.2d at 820.

■ The issue succinctly stated here is whether the language in the Mortician's Malpractice Endorsement providing indemnification for liability due to "any professional malpractice or mistake" includes coverage for the intentional torts committed by Widow. We hold that it does not.

■■ A nonmedical, professional liability policy is often called an "errors-and-omissions" policy and is designed to insure members of a particular professional group from the liability arising out of a special risk such as negligence, omissions, mistakes, and errors inherent in the practice of the profession. 7A Appleman, Insurance Law and Practice, § 4504.01, p. 310. An errors and omissions insurer of a business does not have the duty to indemnify for the malicious and intentional, rather than careless and negligent, acts of the insured, even where the policy does not specifically exclude intentional acts. *United States Fidelity and Guaranty Company v. Fireman's Fund Insurance Company,* 896 F.2d 200, 203 (6th Cir.1990). Again, we turn to Professor Keeton's hornbook, which states:

> The principal reasons for disallowing insurance coverage for losses that result from intentional torts frequently are not applicable to liability coverage that is acquired by professionals (such as doctors or dentists) and businesses. This point is illustrated by a type of coverage question that could arise under a psychiatrist's medical malpractice insurance if a patient's claim were predicated on the theory that the doctor's actions involved an intentional tort. For example, if a psychiatrist has a patient committed to an institution because the doctor views the patient as dangerously psychotic, and as a result of such an involuntary commitment the psychiatrist

> subsequently is held liable on a theory of a false imprisonment, the patient's claim might be asserted as an intentional tort. If a defense on behalf of the psychiatrist based on privilege fails because of a negligent mistake, the insurer might deny liability for the psychiatrist's 'intentional' actions. However, if the decision by the psychiatrist—which caused the patient to be confined—*was taken in good faith, the loss should surely be treated as fortuitous for purposes of a professional liability insurance policy.* This argument for coverage is undoubtedly most persuasive as a response to an insurer's contention that a court should recognize an implied exception to an insured's coverage, but it also has considerable force with respect to the interpretation of any provisions in an insurance policy that are urged as a basis for limiting coverage in comparable situation. In this type of circumstance, courts should treat such consequences as fortuitous.

> There are various situations in which business enterprises may seek coverage for claims that, though they may be classified as suits based on harms intentionally caused by officers or employees, nevertheless involve losses in regard to which a persuasive argument can be made that they should be treated as fortuitous on the basis of an analysis that is similar to that set forth in the preceding paragraph.

Keeton, § 5.4(8) at 533–34 (Emphasis added).

Indiana courts have wrestled with the issue of whether intentional torts are included within the ambit of medical malpractice. Under Indiana's Medical Malpractice Act, Ind.Code 16–9.5–1–1(h) & (g), the term malpractice neither specifically includes nor excludes intentional torts. *Van Sice v. Sentany,* 595 N.E.2d 264, 266 (Ind.Ct.App.1992). The Act applies to the curative or salutary conduct of health care professionals acting in their professional capacities and excludes only that conduct which is unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment. *Id.* In *Collins v. Thakkar,* 552 N.E.2d 507, 511 (Ind.Ct.App.1990), *trans. denied,* we held that the wanton and gratuitous acts committed by a doctor including wrong-

ful abortion, assault and battery, and the intentional infliction of emotional distress were not acts of malpractice under the Act despite the fact that they were inflicted during the rendition of medical services. *Id.* at 511.

In the present case, the trial court specifically found that Widow's actions in disinterring Decedent's body were taken in bad faith, with malice, intentionally to cause Daughter and her family emotional distress. Based on the authority discussed above, we conclude that the Widow's acts were outside the coverage provided under the Endorsement for "professional malpractice and mistake." Therefore, the trial court's entry of summary judgment in favor of the Insurance Company was correct, and we find no error.

### B.

#### Vicarious Liability

■■■ Widow asserts that Serenity Chapel has vicarious liability under the doctrine of respondeat superior, and thus, the trial court erred in determining that Serenity Chapel was not entitled to indemnification under the policy. In support of her argument, Widow relies on the language of *Norfolk & Western Railway Co. v. Hartford Accident & Indemnity Co.*, 420 F.Supp. 92 (N.D.Ind.1976):

> There is, accordingly, a distinction to be made in Indiana law between liability for punitive damages directly imposed and such liability when vicariously imposed. The former situation arises in cases ... in which the corporation itself is found to have acted maliciously or oppressively. The latter situation arises when the corporation, without itself being guilty of willful misconduct, is held to respond in damages for the intentional tort of its agent. In the former case, it would contravene public policy to allow the corporation to shift to an insurer the deterrent award imposed on account of the corporation's own wrongful acts; in the latter case, it would not be inconsistent with public policy to allow the corporation to shift to an insurer the punitive damage award when that award is placed upon the corporation *solely* as a matter of vicarious liability.

420 F.Supp. at 96–97 (Emphasis added). The *Norfolk* court used the Indiana case of *Jeffersonville R. Co. v. Rogers*, 38 Ind. 116 (1871) as an example of the "former" type of case in which would be against public policy to shift a punitive damage award to an insurer because the corporation itself acted willfully and maliciously where the instructions governing subordinate employees and agents were devised in such utter disregard of the rights of others that obedience to them would result in palpable oppression and gross wrong to individuals. *Id.* at 96 (Citing *Jeffersonville*, 28 Ind. at 7).

The issue of corporate vicarious liability was addressed in a similar manner in *Pennbank v. St. Paul Fire and Marine Insurance Company*, 669 F.Supp. 122 (W.D.Pa.1987). The *Pennbank* court held that a bank could not shift a judgment for punitive damages to its insurer where the intentional torts had been conceived, approved and implemented by the highest rank of bank management, including the company's president, senior counsel, and assorted vice presidents. *Id.* at 126. The *Pennbank* court noted:

> To accept [Pennbank's] argument would make all corporations able to pass off liability for punitive damages to an insurer, regardless of the nature of the act or the level of corporate management involved.... Punitive damages are intended to punish the culpable party.. Where corporate management commits an outrageous act, punishment [of the corporation itself] is appropriate. Where the act is committed by a lowly functionary or agent, not pursuant to corporate policy or plan, the corporation, though vicariously liable for punitive damages, is entitled to insure against such damages.

*Id.* As set out in the Keeton hornbook:

> ... the harm for which an insured is vicariously liable often is appropriately viewed as a fortuitous occurrence from the point of view of the insured, as well as the victim. When this is true, courts generally hold that the scope of coverage afforded by liability insurance extends protection for an insured who is vicariously liable for

damages resulting from an intentional tort committed by another person.

\*　　\*　　\*　　\*　　\*　　\*

The approach adopted by courts in such cases generally is not contrary to the public policy principles underlying implied exceptions for intentional torts, and these decisions certainly are in harmony with the desire to assure innocent victims a source of indemnification. Although the evaluation of competing interests may be somewhat more difficult when there are express insurance policy provisions precluding coverage for intentionally-caused injuries, in most instances it seems clear that such coverage restrictions should not be applicable to insureds whose liability is derivative *so long as the intentional torts were not committed under the actual direction or control of the insured.*

Keeton § 5.4(5) at 527—529 (Emphasis added).

In the present case, Widow was the sole shareholder/director involved in the management and operation of Serenity Chapel. Widow herself perpetrated the willful, and malicious acts through her operation of Serenity Chapel which have resulted in the punitive damage award. Thus, based on the authority discussed above, Serenity Chapel itself is appropriately punished and cannot shift the obligation to pay the punitive damages to its insurer. Therefore, the trial court's entry of summary judgment in favor of Insurance Company was appropriate and we find no error.

Judgment affirmed.

RILEY and RUCKER, JJ., concur.