**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jul 03 2012, 9:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**PATRICK F. O'LEARY**
Goshen, Indiana

ATTORNEYS FOR APPELLEE:

**SCOTT S. MORRISSON**
Krieg DeVault LLP
Carmel, Indiana

**JOHN H. LLOYD**
Krieg DeVault LLP
Mishawaka, Indiana

**LIBBY Y. GOODNIGHT**
Krieg DeVault LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

PAUL ROELL,                                )
                                           )
   Appellant-Plaintiff,                )
                                           )
      vs.                        )   No.  20A03-1111-CT-524
                                           )
AMERICAN SENIOR COMMUNITIES,               )
LLP d/b/a EAST LAKE NURSING &              )
REHABILITATION CENTER, and                 )
HARRY SCRIBNER,                            )
                                           )
   Appellees-Defendants.               )

APPEAL FROM THE ELKHART SUPERIOR COURT
The Honorable Charles C. Wicks, Judge
Cause No. 20D05-1001-CT-1

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-plaintiff Paul Roell appeals the judgment in favor of appellees-defendants East Lake Nursing & Rehabilitation Center (East Lake), and Harry Scribner (collectively, the defendants), regarding his claims for assault and intentional infliction of emotional distress against the defendants. Specifically, Roell argues that the trial court erred in dismissing the assault count against East Lake for lack of subject matter jurisdiction, and improperly refused to instruct the jury on the issue of punitive damages, thus essentially granting a directed verdict in East Lake's favor and concluding that it was not liable for punitive damages.

East Lake cross appeals, arguing that the jury's verdict in favor of Roell on his claim for intentional infliction of emotional distress should be vacated because the trial court erred in denying its motion for summary judgment on that count. East Lake claims that the designated evidence established as a matter of law that the tort of intentional infliction of emotional distress was not committed.

Concluding that the trial court properly dismissed Roell's assault claim and finding no other error, we affirm the judgment of the trial court.

FACTS

East Lake is a nursing home facility with 151 rooms in Elkhart, and Roell was East Lake's maintenance director. Roell was hired in June 2002. Christopher Gill arrived at the facility in May 2008, and served as executive director at East Lake. Gill was in charge of East Lake's day-to-day operations. Roell and Gill had worked together with no incident or issues.

In the summer of 2008, Roell took temporary leave under the FMLA from East Lake because of a heart condition. Roell underwent triple coronary bypass and aortic valve replacement surgeries. About the same time that Roell went on leave, East Lake's other maintenance employee moved away, leaving no one to perform the facility's maintenance work. As a result, Gill began looking for someone to fill East Lake's maintenance needs until Roell returned. The search for a maintenance employee was more difficult than anticipated, because someone had to be found who was willing to work full-time on a temporary basis.

Harry Scribner knew Gill from church and socially through their spouses. Scribner heard through others at church about East Lake's need for a maintenance employee and offered to work there. Gill understood Scribner to have good maintenance skills and experience.

Although Gill knew that Scribner had "a troubled past," he did not know, initially, that Scribner had a prior felony conviction for forgery. Scribner had served two years in prison following his conviction for that offense. Tr. p. 176, 218-19. Gill personally

3

contacted Scribner's references, and all of the responses were positive. As a result, Gill hired Scribner as East Lake's maintenance employee. Gill received a background report on Scribner sometime after July 14, and learned about the forgery conviction. Gill placed his initials at the bottom of the report.

On August 9, three weeks after Gill learned of Scribner's forgery conviction, Scribner completed an employment application and stated that he would be available for work beginning August 18. In response to the question as to whether he had ever been convicted of a criminal offense, Scribner wrote "no" on the application form. Ex. 23.

Roell fully recovered from his heart condition and returned to work at East Lake on September 15, 2008. Roell believed that he had no restrictions and described his physical and mental health as "excellent" and "fantastic." Tr. p. 80-81, Ex. 16. When Roell returned, Gill sent him a memo, stating, "Welcome Back Paul! We're glad you're back to work and ready to roll." Id. at 73-76, 225-28, Ex. 12. The memo outlined instructions on several long-term maintenance projects for East Lake.

Roell met with Scribner when he returned to work. When Roell told Scribner that he would go back to being the full-time maintenance director and that Scribner would become a part-time employee, Scribner became upset and angry. In essence, Scribner's attitude changed after learning that he would no longer be employed as East Lake's full-time maintenance employee.

On September 16, 2008, Roell and Scribner engaged in a heated argument. The conversation began in the mailroom and proceeded down the hallway and into a 30 x 40

4

foot maintenance room. The room is locked, but only from the outside. From the inside, one simply needs to twist the door knob to leave. Outside the maintenance room are several rooms for East Lake's residents. Aides, nurses, and other individuals are constantly going in and out of the rooms, and the hall outside the maintenance room is seldom empty.

When the incident occurred, Roell and Scribner remained at their respective desks during part of the argument, which were some distance from each other. At other times, Scribner walked around the maintenance room, but Roell never left his seat from behind the desk. Although Roell and Scribner never got "face to face" during the incident, they came within approximately one foot of each other.

Roell tape recorded the argument. Also, Roell never walked out of the maintenance room during the argument because he believed that he was the person in charge and should continue working. There were moments of silence during the argument, but Roell would start talking to Scribner again, discussing work-related matters such as furniture in the maintenance room and bills that needed to be paid. On several occasions, Roell asked Scribner, "Do you hear [me]?" Tr. p. 84-85, 91-92; Ex. 13. Scribner berated Roell several times during this incident, accusing him of lacking the proper organizational skills in the past and for trying to undue the progress that Scribner had achieved in cleaning and organizing the work space. The encounter lasted approximately eighteen minutes.

5

After this confrontation, Roell reported to Gill that he was having problems with Scribner and that Scribner was "out of hand." Tr. p. 19, 44, 229. Roell said nothing to Gill about a tape recorder. Gill had a difficult time understanding why Roell and Scribner were having such difficulties getting along after just two days of working together. Gill told Roell that he thought the two should be able to get along and that he would discuss the matter with Scribner. However, Gill had a separate conversation with Scribner, indicating that East Lake desired to "get rid of Roell." Scribner Dep. P. 34, 35.

The next day, on September 17, 2008, Gill spoke to Scribner about the situation. Gill conferred with both Roell and Scribner and encouraged both of them to "get along ." Id. at 230, 285. Gill told both men that he believed that the two men complemented each other. Apparently, East Lake had offered Roell a severance package. But Gill never told Scribner of such a plan. However, Scribner believed that Gill had implied to him that they should "get rid of Roell" because he could not handle the physical demands of the job in light of his health problems. Appellant's Br. p. 5.

The next day, a second heated argument occurred between Roell and Scribner. Roell also recorded this conversation. Id. at 20, 284-85. At some point, Scribner noticed a blinking red light in Roell's shirt pocket and deduced that Roell had a tape recorder. When Scribner asked Roell whether he was taping their conversation, Roell erroneously stated that he had turned off the tape recorder.

The September 18 argument between Roell and Scribner took place in the maintenance room and lasted nearly twenty minutes. Again, there was no physical

6

contact between Roell and Scribner, and Roell would interject various comments after moments of silence. During the encounter, Scribner called Roell a "piece of sh*t," explaining later that it is just "a phrase." Id. at 280; Ex. 13. Scribner also called Roell a "liar," and a "cockroach," a term that he uses when referring to other work supervisors. Id. at 268-69, 280-81, 283; Ex. 13. The confrontation in the maintenance room ended when Roell stood up and walked away. At some point, Roell believed that Scribner was going to hit him and put him back in the hospital.

Roell reported the incident to Gill the next day. Gill and the Regional Director of Operations, Kim Hughes, listened to a portion of Roell's tape recordings of the two arguments with Scribner.

After the second encounter with Scribner on September 18, Roell felt:

very poorly physically and mentally. Physically, I felt tired. I had tightness in my arms and in my chest in the area around my heart. I had shortness of breath. My face felt flushed. I was concerned that I suffered an exacerbation of my heart condition. I decided to request medical attention from Mr. Gill.

Appellant's App. p. 122, 137.

Following the second confrontation with Scribner, Roell went home on an intermittent basis and stopped working. Roell claimed that he was suffering emotional distress, anxiety, and humiliation and needed care for his nerves, which prevented him from working.

On September 20, 2008, Gill memorialized his thoughts regarding the situation involving Roell and Scribner in a written memorandum. Gill's memo stated as follows:

7

1. I do not like the thought that my maintenance director is carrying around a tape recorder, taping private conversations. I personally don't feel that I can trust him at this time. I'm also worried that by allowing him to continue working at [East Lake], after it becomes known that [Roell] was taping conversations, that it will either foster a paranoid workplace, and/or, encourage other staff to also tape their conversations. Can you imagine a workplace where employees are taping each other's words? Or C.N.A.'s begin taping their conversations with residents and families?

2. I do not believe either [Scribner] or [Roell] behaved in a professional manner. Their anger toward each other has in just five work days created a negative impression of the maintenance staff. It also appears from the taped conversation that [Scribner] was disrespectful toward his supervisor; but I'm also not comfortable with thinking its [sic] all [Scribner]. It feels to me that [Roell] set [Scribner] up by how he initiated the conversation and by taping it, with the intent of sharing it with others.

3. I would personally prefer to see both of them terminated. In light of past concerns about [Roell's] work, the current negativity and the taping situation, I think it would be best to start over with a new maintenance department leader.

Appellee's App. p. 49, 54.

On September 22, 2008, Patricia Rowe, Vice President of Human Resources for East Lake, agreed that both Roell and Scribner should be terminated and instructed Gill to discharge both men. Scribner was subsequently discharged. At the time of this conversation, nether Gill nor Rowe was aware that Roell planned to file a claim for worker's compensation.

On September 25, 2008, Gill met with Roell in an office at East Lake. During this meeting, Gill informed Roell that East Lake was going to terminate his employment. Roell requested that Gill reconsider his discharge, and Gill stated that he would consider

8

Roell's request and contact Roell within three business days. The next morning, Gill attempted to contact Roell by telephone to inform him that his request had been denied and that his employment was indeed terminated.

On September 26, 2008, Roell "requested that Gill turn his claim in to East Lake's worker's compensation insurance company and send him to a physician for treatment[.]" Id. at 58, 60. Roell applied for worker's compensation benefits and was seen by East Lake's worker's compensation doctor, and East Lake paid for all of these visits.

Litigation first commenced on November 14, 2008, where Roell asserted that he was wrongfully terminated by East Lake in retaliation for making a worker's compensation claim. On December 28, 2009, the trial court granted summary judgment in favor of East Lake, concluding that East Lake did not discharge Roell in retaliation for making a worker's compensation claim. On appeal, we affirmed the trial court's judgment in East Lake's favor. Roell v. American Senior Communities, No. 20A03–1001–CC–7 (Ind. Ct. App. June 17, 2010), trans. denied. More specifically, we determined that East Lake's decision to terminate Roell was made before he notified East Lake of his intent to file a worker's compensation claim and that East Lake had articulated "legitimate, nondiscriminatory reasons for Roell's discharge." Id. at 5.

Following the trial court's adverse ruling in the retaliatory discharge case, Roell filed a second complaint—the current litigation—against Scribner and East Lake on January 4, 2010. This complaint asserted claims against Scribner and East Lake for assault and intentional infliction of emotional distress that arose out of the incident

9

between Roell and Scribner. Roell alleged, among other things, that "as part of a scheme or plan to remove Mr. Roell from East Lake, Defendant East Lake, acting through its executive director Gill, intentionally incited, encouraged, and enabled Scribner to inflict upon Mr. Roell severe emotional distress, anxiety, and humiliation. Defendant East Lake and Scribner conspired to cause Mr. Roell to resign his employment." Appellant's App. p. 23. In Counts II-IV of the complaint, Roell requested punitive damages against both East Lake and Scribner for assault and intentional infliction of emotional distress.

On March 5, 2010, East Lake filed a motion to dismiss the assault and intentional infliction of emotional distress claims pursuant to Indiana Trial Rules 12(B)(1), 12(B)(6), and 12(B)(8). East Lake argued, among other things, that Roell's claims against it were barred as a matter of law by the doctrine of judicial estoppel because of the earlier adjudication of his retaliatory discharge claim, and by the exclusive remedy provision of the Indiana Worker's Compensation Act (WCA), Ind. Code §§ 22-3-2, et seq.

On May 21, 2010, the trial court granted East Lake's motion to dismiss Roell's assault claim for lack of subject matter jurisdiction under Trial Rule 12(B)(1), based on the exclusivity provision of the WCA. However, the trial court denied East Lake's motion to dismiss Roell's claim for intentional infliction of emotional distress. Id. at 14-20. The trial court explained:

> It is difficult to see how the integrity of the exclusivity provision of the Worker's Compensation Act could be maintained if [Roell] is allowed to proceed on [the assault claim] especially when [Roell] in his affidavit submitted in [his] response to the motion to dismiss has alleged he was in need of medical care, felt poor physically, had tightness in his arms and

10

chest, was short of breath and feared that he suffered an exacerbation of his heart condition. Allowing [the assault claim] to proceed would open the door to all of these claims and [East Lake's] motion is well taken with regard to [the assault claim]. [Roell's intentional infliction of emotional distress claim] on the other hand involving purely a claim for emotional distress is not similarly barred [by the WCA].

Appellant's App., p. 18-19. The trial court further determined that "[i]f the assault is simply the emotional effect of the altercation [between Roell and Scribner], the [assault] claim is preserved with regard to [the] intentional injury claimed in [Roell's action for intentional infliction of emotional distress]." Id. at 18. The trial court dismissed Roell's assault claim with prejudice and declared it "a final appealable judgment[.]" Id. at 20.

On August 12, 2010, East Lake filed a motion for summary judgment with regard to Roell's remaining claim against it for intentional infliction of emotional distress. In general, East Lake maintained that Roell's claim fails as a matter of law because Scribner's conduct was not "extreme and outrageous." Appellee's Br. p. 80. In essence, East Lake contends that although Scribner's comments to Roell might have been vulgar and insulting, they did not rise to the level of being actionable.

In the alternative, East Lake contended that even if the action survives summary judgment, it is not liable for Scribner's actions. More particularly, East Lake asserts that there is no evidence of a scheme or plan or conspiracy between Scribner and East Lake, nor was Scribner acting in the course and scope of his employment "when he allegedly inflicted intentional emotional distress as Plaintiffs also allege."[1]

---

[1] Roell's wife also brought a claim for loss of consortium.

11

The trial court denied East Lake's motion for summary judgment on December 2, 2010. In particular, the trial court reasoned:

> It is not just the words that . . . Scribner had used which were extreme but rather the tone of his conversation, his attitude of complete hostility and the long nature of the verbal assault which makes the conduct patently offensive. A community of citizens such as we find in a jury panel should be the ones who decide whether the words and conduct offend community standards. Harry Scribner denies that he was intending to inflict emotional distress but his actions were offensive. It is clearly a genuine issue of material fact as to whether his conduct was extreme and outrageous so as to constitute an intentional infliction of emotional distress.
>
> . . .
>
> Although the evidence in this case is more circumstantial than direct, it is still a question of fact for a jury to decide if the evidence convincingly shows that Scribner acted as an agent of Gill in berating Roell attempting to drive him out of the business.
>
> . . .
>
> There being genuine issues of material . . . fact in this cause which cannot be resolved by way of a summary judgment, . . . East Lake's motion for summary judgment is hereby denied.

Appellees' App. p. 244-46.

On October 26, 2011, a three-day jury trial commenced on Roell's claim for intentional infliction of emotional distress against Scribner and East Lake.[2] On the first day of trial, Roell filed his amended proposed preliminary and final jury instructions. Roell's tendered instructions included preliminary instructions and thirteen final instructions. Roell's tendered instructions contained three instructions relating to punitive damages that were found at plaintiff's amended proposed final jury instruction

---

[2] Roell did not pursue his pending assault claim against Scribner at trial.

12

Nos. 11-13. At the close of Roell's case-in-chief, East Lake moved for a directed verdict, which the trial court denied.

Following the close of the evidence, the trial court conducted a jury instruction conference with counsel during which the parties' tendered final instructions, including Roell's proposed final jury instructions numbers 11-13 on punitive damages, were considered. The trial court declined to instruct the jury on punitive damages against East Lake. The trial court agreed to instruct the jury on punitive damages against Scribner individually, but Roell withdrew any request that the jury be instructed on punitive damages against Scribner alone.

On October 28, 2011, the jury returned a verdict in favor of Roell and against Scribner and East Lake, jointly and severally, in the amount of $25,000, as compensatory damages for Roell's intentional infliction of emotional distress claim. Roell now appeals.

## I. Assault Claim

Roell first contends that the trial court erred in dismissing his claim for assault against East Lake. Specifically, Roell claims that the trial court erroneously dismissed that claim for lack of subject matter jurisdiction in accordance with Indiana Trial Rule 12(B)(1) because the injury that he suffered was non-physical. Roell maintains that the exclusive remedy provision of the WCA does not bar this claim.

In resolving this issue, we note that an action that is barred by the exclusive remedy provision of the WCA is in regards to the trial court's subject matter jurisdiction. Branham v. Celadon Trucking Serv's., Inc., 744 N.E.2d 514, 519 (Ind. Ct. App. 2001).

13

When ruling on a motion to dismiss for lack of subject matter jurisdiction, the trial court may resolve factual disputes. Id. The trial court may consider not only the complaint and the motion, but any evidence submitted as well. Id. The trial court may then weigh the evidence to determine the existence of the requisite jurisdictional facts. Id.

Once the issue of exclusivity under the WCA is raised, the burden shifts to the plaintiff to prove that the claim falls outside the scope of the WCA. Id.; see also Eichstadt v. Frisch's Restaurants, Inc., 879 N.E.2d 1207, 1210 (Ind. Ct. App. 2008). If the trial court resolved disputed facts, as it did in this case, the trial court's factual findings and judgment must be given deference. Id. at 1209-10. We will only reverse if the findings and judgment are clearly erroneous. Id. at 1210.

Under Indiana Code Section 22-3-2-6, "[t]he rights and remedies granted to an employee subject to IC 22-3-2 through IC 22-3-6 on account of personal injury or death by accident shall exclude all other rights and remedies of such employee, the employee's personal representatives, dependents, or next of kin, at common law or otherwise, on account of such injury or death, except for remedies available under IC 5-2-6.1." The WCA thus "provides the exclusive remedy against an employer for injuries occurring by accident, that arise out of and in the course of the injured party's employment." Eichstadt, 879 N.E.2d at 1210.

The phrase "by accident" in the WCA is very broadly construed and includes intentional actions by co-workers, such as those that Roell alleges here. See id. at 1210-11. The focus of the "by accident" inquiry is not on the employee who caused the injury

14

or the employee's intentional acts, but rather, on the employer and the intent to harm. Tippmann v. Hensley, 716 N.E.2d 372, 375-76 (Ind. 1999).

Before an injury can be said to have been intended by an employer, and therefore not be "by accident" for purposes of coverage under the WCA, the employer itself must have intended the injury. Eichstadt, 879 N.E.2d at 1210. More particularly, "[i]t must be the employer who harbors the intent, and not merely a supervisor, manager, or foreman." Id. The employer "must have intended the injury or had actual knowledge that an injury was certain to occur." Id. Notably, even if the supervisor or manager has a high level of responsibility, this does not establish the employer's intent unless the supervisor or manager owned or otherwise controlled the business—in other words, was the alter ego of the business. Id. at 1212.

As Roell asserts above, his injuries are purely non-physical in nature such that they are not barred by the WCA's exclusive remedy provision. In focusing on the nature of his injuries, Roell relies on a series of cases for the sweeping proposition that the WCA never applies to non-physical injuries. Notwithstanding Roell's contention, the terms "personal injury" within the meaning of the WCA includes both physical injury and "the somewhat different [notion] of disability." Perry v. Stitzer Buick GMC, Inc., 637 N.E.2d 1282, 1288 (Ind. 1994). "Disability" refers to an injured employee's "inability to work," and the extent of the disability is determined "by a worker's physical and mental fitness for various employment opportunities." Id. In Perry, for example, our Supreme Court held that the employee's claims of embarrassment, humiliation, and stress

15

were not barred by the WCA because the claimed injuries were not physical and because there was no mental "disability" as contemplated by the WCA, since the employee was able to continue performing his work duties. Id. at 1288-89; see also Branham, 744 N.E.2d at 520-21 (discussing Perry, noting that emotional injuries can be covered by the WCA if there is a "disabling quality"). Even workplace anxiety or emotional distress can come within the meaning of the WCA if it constitutes a mental "disability" covered by the statute. See Hansen v. Von Duprin, Inc., 507 N.E.2d 573, 576-77 (Ind. 1987) (holding that the plaintiff employees' emotional injury, anxiety and depression, were compensable under the WCA); Branham, 744 N.E.2d at 520-21 (discussing Hansen, observing that it was "the disabling aspect of the plaintiff's condition that brought it within the WCA's definition of injury").

In this case, although Roell argues that he suffered emotional distress, anxiety, and humiliation as a result of the confrontations with Scribner, he fails to mention his own admissions that these alleged injuries were disabling and prevented him from working. Appellant's App. p. 23, 47, 119, 121-122, 141. Roell also actually made a claim for worker's compensation benefits and received care and treatment that was paid by East Lake through worker's compensation. Id. at 58, 60, 123-24, 141. In our view, these undisputed facts implicate a mental "disability" within the meaning of the WCA and the authorities cited by Roell on appeal.

Also, even though Roell asserts that his claimed injuries are merely non-physical in nature, he has repeatedly interjected the physical injuries that he sustained into this

16

lawsuit. As the trial court noted in the order granting East Lake's motion to dismiss, Roell's own affidavit, which he submitted in opposition to East Lake's motion to dismiss, verified under oath that Scribner's actions caused him to feel:

> very poorly physically and mentally. Physically, I felt tired. I had tightness in my arms and in my chest in the area around my heart. I had shortness of breath. My face felt flushed. I was concerned that I suffered an exacerbation of my heart condition. I decided to request medical attention from Mr. Gill.

Appellant's App. p. 137.

Roell's testimony that was tendered to the trial court as part of East Lake's motion to dismiss, was that he felt he needed to get help both "mentally and physically[.]" Appellant's App., p. 122 (emphasis added). Moreover, Roell interjected his physical injuries for the jury to consider in offering testimony from his treating physicians about his physical condition. As a result, the circumstances here are easily distinguishable from Perry and the others to which Roell has directed us.

In none of those particular cases did the plaintiff make a claim of physical injury. See Perry, 637 N.E.2d at 1288 (observing that the plaintiff had not sustained a physical injury or loss of physical function). In short, Roell's injuries for which he seeks recovery are not, as he asserts, purely emotional in nature and, as such, he cannot rely on those other authorities in support of his claim. See Hart v. Webster, 894 N.E.2d 1032, 1036-37 (Ind. Ct. App. 2008) (concluding that where the complaint alleged defamation causing embarrassment, humiliation, and emotional and physical distress to the point that the employee was unable to work, the complaint fell under the WCA and must be dismissed).

17

In sum, we agree with the trial court's statement that the "integrity of the exclusivity provision of the WCA" cannot be maintained if Roell were permitted to proceed with his assault claim under these circumstances. Appellant's App. p. 18-19. Therefore, for the reasons stated above, we conclude that the trial court properly determined that Roell's claim of assault was barred by the exclusive remedy provision of the WCA and was properly dismissed for lack of subject matter jurisdiction pursuant to Trial Rule 12(B)(1).

## II. Punitive Damages

Roell next claims that the trial court's ruling with regard to punitive damages was erroneous. More particularly, Roell claims that the trial court erred in granting a directed verdict that East Lake was not liable for punitive damages[3] because the evidence demonstrated that "Scribner was acting within the scope of his employment when he committed the tortious conduct." Appellant's Br. p. 12.

In resolving this issue, we initially observe that to preserve for appellate review an issue regarding the propriety of a trial court's refusal to give a proposed jury instruction, a party must comply with Appellate Rule 46(A)(8)(e). Richardson v. State, 697 N.E.2d 462, 465 (Ind. 1998) (applying former Appellate Rule 8.3(A)(7), which is identical to the current iteration of the rule). Appellate Rule 46(A)(8)(e) provides that when error is predicated on the giving or refusing of any instruction, "the instruction shall be set out

---

[3] Contrary to Roell's contention, the trial court never entered a directed verdict for East Lake. Rather, Roell's appeal regarding punitive damages presents a jury instruction issue and is not an appeal from a directed verdict. Tr. p. 299-300.

verbatim in the argument section of the brief with the verbatim objections, if any, made thereto." The failure to comply with this mandate results in waiver of the issue on appeal. Richardson, 697 N.E.2d at 465.

In this case, Roell does not set out verbatim in the argument section of his appellate brief—or anywhere for that matter—the punitive damages instructions he maintains the trial court wrongfully refused to give. Thus, Roell has waived the issue on this basis. Moreover, Roell's Appendix does not include the actual punitive damages instructions the trial court decided should not be given to the jury. Appellant's App. p. 153-58. Roell's Appendix contains "Plaintiff's Proposed Final Jury Instruction Nos. 9-11" that were tendered on October 14, 2011. Appellant's App. p. 153-58. Roell fails to mention, makes no argument regarding, and does not include in his Appendix, the Plaintiff's Amended Proposed Final Jury Instruction Nos. 11-13, which were filed on October 26, 2011, the first day of trial. Appellees' App. p. 1-29. Indeed, it is these amended instructions that were the subject of debate during the conference on final jury instructions and the trial court's rulings. Tr. p. 299-300. Accordingly, Roell has presented nothing for us to consider with respect to punitive damages.

Finally, we note that Roell is attempting to raise specific theories of liability for punitive damages for the first time on appeal. More particularly, Roell claims that (1) East Lake could have been "vicariously liable" for punitive damages arising from Scribner's allegedly tortious conduct that supported a punitive damages award against Scribner himself; and (2) that "Gill was East Lake's "managerial agent" within the

19

meaning of Section 909 of the Restatement (Second) of Torts such that punitive damages could be awarded against East Lake as Gill's principal. Appellant's Br. p. 14-15. These specific theories of liability for punitive damages were not asserted in the trial court, and Roell never cited any of the legal authorities that he now invokes for his vicarious liability and managerial agent arguments. Even more compelling, we note that Roell's sole objection during the colloquy on final jury instructions at trial was as follows:

> [T]he plaintiff's objection is the instruction that was not given. Plaintiff believes that there was sufficient evidence from the jury to be instructed on the issue of punitive damages against . . . the employer, East Lake. Believe that there's – the jury could find that East Lake had the requisite malice and we'd object that there's – that plaintiff['s] tendered jury instruction pertaining to punitive damages will not be given."

Id. at 299.

A party waives appellate review of an issue or argument if the issue or argument is not first raised before the trial court. Hoagland v. Town of Clear Lake, 871 N.E.2d 376, 382 n.5 (Ind. Ct. App. 2007). Further, a party is precluded from changing its theory on appeal and arguing an issue that was not properly presented to the trial court. Pardue v. Smith, 875 N.E.2d 285, 289-90 (Ind. Ct. App. 2007). The changing of theories is substantially indistinguishable from having never raised the issue in the first instance. Farris v. State, 753 N.E.2d 641, 646 (Ind. 2001). As discussed above, Roell failed to advance the vicarious liability and managerial agent arguments for imposing punitive damages against East Lake at the trial court level. Tr. p. 299-300. He failed to tender any

proposed jury instructions that remotely cover these theories of liability for punitive damages against East Lake. Appellant's App. p. 153-58; Appellees' App. p. 1-29.

Roell also failed to direct the trial court's attention to any of the legal authorities he relies on now, including Stevenson v. Hamilton Mut. Ins. Co., 672 N.E.2d 467 (Ind. Ct. App. 1996), and the Restatement, for the propriety of a jury instruction regarding derivative punitive damages against East Lake. Appellant's Br. p. 12-15; Appellant's App. p. 153-58; Appellees' App. p. 1-29; Tr. p. 299-300. Instead, Roell limited his objection to the trial court's jury instructions on grounds of sufficiency of the evidence supporting East Lake's own alleged malice, not on any purported derivative conduct by Scribner or Gill. Tr. p. 299-300. Indeed, Roell expressly disavowed any jury instructions on the issue of punitive damages against Scribner individually. Id. Consequently, for these additional reasons, any perceived error in the trial court's jury instructions is waived. See Johnson v. Wait, 947 N.E.2d 951, 958 (Ind. Ct. App. 2011) (concluding that an argument that a jury instruction was an incorrect statement of law was waived on appeal because that argument was not raised in the trial court), trans. denied; White v. State, 687 N.E.2d 178, 179 (Ind. 1997) (finding appeal of trial court's refusal to instruct the jury on matter waived where defendant failed to tender jury instruction on the issue).

### III. Cross Appeal; Intentional Infliction of Emotional Distress

East Lake contends on cross appeal that the trial court should have granted its motion for summary judgment with regard to Roell's claim for intentional infliction of emotional distress. More particularly, East Lake argues that even if Scribner's actions

21

were inappropriate and/or unprofessional, Scribner's conduct did "not rise to the level of extreme and outrageous conduct necessary to support an intentional infliction of emotional distress cause of action as a matter of law." Appellees' Br. p. 37. Thus, East Lake contends that the jury's verdict should be set aside.

## A.  Standard of Review—Summary Judgment

Our standard of review for summary judgment appeals is well established:

> When reviewing a grant of summary judgment, our standard of review is the same as that of the trial court. Considering only those facts that the parties designated to the trial court, we must determine whether there is a "genuine issue as to any material fact" and whether "the moving party is entitled to a judgment a matter of law." In answering these questions, the reviewing court construes all factual inferences in the non-moving party's favor and resolves all doubts as to the existence of a material issue against the moving party. The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law; and once the movant satisfies the burden, the burden then shifts to the non-moving party to designate and produce evidence of facts showing the existence of a genuine issue of material fact.

Dreaded, Inc. v. St. Paul Guardian Ins. Co., 904 N.E.2d 1267, 1269-70 (Ind. 2009).

## B.  East Lake's Contentions

Indiana recognizes the tort of intentional infliction of emotional distress as extreme and outrageous conduct intentionally or recklessly causing severe emotional distress to another. Cullison v. Medley, 570 N.E.2d 27, 31 (Ind. 1991). The basis of the tort is the intent to cause intentional emotional harm. Id. Conduct is considered "extreme and outrageous" when:

22

the conduct has been so outrageous in character, and so extreme in degree, as to go on beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, Outrageous!

Powdertech, Inc. v. Joganic, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002).

East Lake directs us to several cases in support of its contention that summary judgment should have been granted in its favor. For instance, in Branham v. Celadon Trucking Services, Inc., 744 N.E.2d 514 (Ind. Ct. App. 2001), the plaintiff sued for intentional infliction of emotional distress after co-employees took an obscene photograph of the plaintiff while he was sleeping. The evidence before the court was that the conduct complained of was a joke and that defendants did not intend to harm plaintiff. On these grounds, this court determined that the defendants were entitled to summary judgment on the plaintiff's claim of intentional infliction of emotional distress. Id. at 523-24. Also, in Ledbetter v. Ross, 725 N.E.2d 120, 124 (Ind. Ct. App. 2000), a social worker had made a telephone call and revealed some confidential information. It was determined that the plaintiff was unable to point to any facts or inference to suggest that the defendant had telephoned her with the intent to harm her emotionally. Finally, in Dietz v. Finlay Fine Jewelry Corp., 754 N.E.2d 958, 970 (Ind. Ct. App. 2001), it was held that no extreme outrageous conduct was found as a matter of law where a security manager of a department store accused the plaintiff-employee of substance abuse,

23

shoplifting, and dishonesty in a very rough and intimidating manner, because such conduct did not exceed "all bounds usually tolerated by society."

Notwithstanding these cases, we find the circumstances here more akin to those in Bradley v. Hall, 720 N.E.2d 747 (Ind. Ct. App. 1999). In Bradley, a former employee sued her supervisor for, among other things, intentional infliction of emotional distress. The plaintiff alleged that, for approximately twenty years, the defendant shouted at her, harassed her, and criticized her in front of other employees. On several occasions, the defendant asked the plaintiff questions of a sexual nature about the plaintiff and her husband.

The trial court granted summary judgment in the defendant's favor and the plaintiff appealed. On appeal, the plaintiff challenged the trial court's determination that she had offered no evidence that the defendant intended to harm her emotionally. With regard to this issue, we observed that the defendant's pattern of conduct and the plaintiff's testimony "permitted an inference that [the defendant] acted with the intent to harm emotionally." Id. at 752. As to whether the defendant's conduct was "extreme and outrageous," the Bradley court stated that this issue should be decided by a jury and reversed the trial court's grant of summary judgment. Noting the rather imprecise standard of what constitutes "extreme and outrageous," the Bradley court stated that the answer "depends, in part, upon prevailing cultural norms and values." Id. at 753.

In this case, the designated evidence established that Scribner's conduct was neither a prank, nor a mere workplace dispute, nor that it was unintended. Rather,

24

Roell's evidence—both at the summary judgment stage and at trial—established that a reasonable jury could conclude that Scribner's actions were part of a plan to get Roell to leave his employment at East Lake, and that the sole purpose of Schribner's face-to-face encounters with Roell, including the insults, screams, intimidation, and threats, were to force Roell to quit.

Moreover, the designated evidence established that East Lake had sanctioned this plan. Roell designated the affidavit of Rose Hairell, his immediate supervisor at East Lake. In her affidavit, Ms. Hairell testified that she was East Lake's Environmental Director from March 1996 until July 2008; that Roell was an outstanding employee; and that on at least three occasions, Gill had conversations with her in which he expressed his desire to "get rid" of Roell. Hairell testified that she was puzzled by Gill's animosity toward Roell because of Roell's very positive performance evaluations. Appellees' App. 116.

Roell also argued in his motion for summary judgment, and subsequently at trial, that the impact of Scribner's behavior on September 16th and 18th was aggravated and magnified by several factors:

- Roell's advanced age and poor health;

- Roell's sternum incision. His physician had cautioned against any forceful blow to the chest for one year;

- Roell's unfamiliarity with Scribner. They were introduced for the first time on September 15th;

- The remote location of the maintenance room where the incidents occurred;

● The second and more severe incident on September 18, lasted almost 20 minutes;

● Scribner stood over Roell, who was seated less than one foot away;

● Scribner was aware of Roell's heart condition and surgery.[4]

Appellees' App. p. 137.

When considering these circumstances, the trial court's determination to deny summary judgment and to allow the jury to decide whether Scribner acted with intent to cause Roell emotional harm reflects an understanding that, where there is evidence that a defendant acted with the sole intent to cause emotional harm, a jury is best suited to determine whether the defendant's words and conduct "offend community standards." Thus, the trial court's ruling is consistent with the <u>Bradley</u> court's observation that the reference often must be made to community norms and values in determining what constitutes extreme and outrageous behavior. Hence, we conclude that the trial court properly denied East Lake's motion for summary judgment, and we decline to set aside the jury's verdict with regard to Roell's claim against East Lake for intentional infliction of emotional distress.

The judgment of the trial court is affirmed.

---

[4] By way of illustration, in <u>Kolegas v. Hefiel Broadcasting Corp.</u>, 607 N.E.2d 201, 211 (Ill. 1992), it was determined that whether a defendant's conduct may be deemed outrageous, a factor to be considered "is the defendant's awareness that the plaintiff is particularly susceptible to emotional distress, because of some physical or mental condition or peculiarity. Behavior that might otherwise be considered merely rude, abrasive or inconsiderate, may be deemed outrageous if the defendant knows that the plaintiff is particularly susceptible to emotional distress."

BROWN, J., concurs.

KIRSCH, J., concurs in part and dissents in part.

# IN THE
# COURT OF APPEALS OF INDIANA

PAUL ROELL,                                    )
                                               )
    Appellant-Appellant                )
                                               )
        vs.                          )    No.  20A03-1111-CT-524
                                               )
AMERICAN SENIOR COMMUNITIES, LLP,              )
d/b/a EAST LAKE NURSING &                       )
REHABILTATION CENTER, and                       )
HARRY SCRIBNER,                                )
                                               )
    Appellees-Defendants.              )

**KIRSCH, Judge,** *concurring in part and dissenting in part.*

"The law does not provide a remedy for every annoyance that occurs in everyday life. Many things which are distressing or may be lacking in propriety or good taste are not actionable." *Kelley v. Post Publishing Company,* 327 Mass. 275, 98 N.E.2d 286, 287 (1951) (quoted in *Lee v. Weston,* 402 N.E.2d 23, 30 n.2 (Ind. Ct. App.1980) and *Branham v. Celadon Trucking Services, In*c., 744 N.E.2d 514, 518 (Ind. Ct. App. 2001)).

What constitutes extreme and outrageous conduct depends, in part, upon prevailing cultural norms and values. In the appropriate case, the question can be decided as a matter of law. *See, e.g., Conwell v. Beatty,* 667 N.E.2d 768, 775-77 (Ind. Ct. App.1996) (no outrageous conduct where sheriff announced deputy's arrest at press conference and refused to assist deputy in completing retirement forms); *Gable v. Curtis,*

28

673 N.E.2d 805, 809-11 (Ind. Ct. App.1996) (no outrageous conduct where contractor's wife phoned purchaser seven times in one hour, screaming, threatening to repossess home and to come over, and stating repeatedly that the purchasers "would pay").

To support a finding of outrage and a judgment for intentional infliction of emotional distress, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond *all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."* [Emphasis added.] *Bradley v. Hall*, 720 N.E.2d 747, 752-53 (Ind. Ct. App. 1999) (quoting RESTATEMENT (SECOND) OF TORTS § 46).

Here, Harry Scribner called Paul Roell a "piece of shit," "a liar," "a cockroach," "a team destroyer," and "a gossip who tears other people down," said that he was "an instigator" and "a gossip" and a "two faced person who tears down other people," and claimed that he was "only here for [himself]," "taking care of [himself]" and had "done very little for this company." Appellant's Br. at 7. To be sure, Scribner's statements to Roell were rude, crude, lacking in propriety and good taste. They did not, however, rise to the level of outrage required to support a judgment for intentional infliction of emotional distress.

I respectfully dissent from that part of the majority decision to affirm the trial court's denial of East Lake's motion for summary judgment and the subsequent judgment on the jury's verdict on Roell's claim for intentional infliction of emotional distress. In all other respects, I concur with the decision of my colleagues.

29